# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

LEATRICE CATO,

     *Plaintiff*,

*v.*                         CASE NO. 4:13-CV-14595

COMMISSIONER OF SOCIAL       DISTRICT JUDGE MARK A. GOLDSMITH
SECURITY,                       MAGISTRATE JUDGE PATRICIA T. MORRIS

     *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's decision. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and Defendant's Motion for Summary Judgment be **GRANTED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned to review the Commissioner's decision denying Plaintiff's claim for Disability Insurance Benefits ("DIB") under Title II of the Social

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Security Act 42 U.S.C. § 401-34. This matter is currently before the Court on cross-motions for summary judgment. (Docs. 15, 18.)

Plaintiff Leatrice Cato was thirty-eight years old on December 1, 2006, the date she alleges her disability began. (Transcript, Doc. 11 at 115.) She has past relevant work experience as a credit reference clerk and shoe salesperson. (Tr. at 78, 136.) On April 6, 2011, Plaintiff filed the present claim for DIB. (Tr. at 115.) The claim was denied at the initial administrative stage. (Tr. at 93.) In denying the claims, the Commissioner considered heart valve disease, other heart valve issues, and migraines. (*Id.*) On March 16, 2012, Plaintiff appeared before Administrative Law Judge ("ALJ") J. William Callahan, who considered the application for benefits de novo. (Tr. at 36-82.) In his decision issued on May 18, 2012, the ALJ found that Plaintiff was not disabled. (Tr. at 24, 31.) Plaintiff requested a review of this decision on June 20, 2012. (Tr. at 17-18.)

The ALJ's decision became the Commissioner's final decision, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on July 31, 2013, when the Appeals Council denied Plaintiff's request for review. (Tr. at 3-5.) On November 4, 2013, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision. (Compl., Doc. 1.) Plaintiff's complaint was filed after the deadline for seeking federal court review had passed. Rejected applicants may file in court within sixty days of receiving notice from the Commissioner. 42 U.S.C. § 405(g). The filing period acts as a statute of limitations, *Bowen v. City of New York*, 476 U.S. 467, 478 (1986), which the Commissioner may extend. 42 U.S.C. § 405(g). To receive an extension, the applicant must petition the Commissioner in writing and show good cause for the request. Soc. Sec. Admin., *Hearings, Appeals & Litigation Law Manual* I-3-9-60.

Plaintiff filed outside the sixty-day limit but attached to her complaint a letter requesting the Commissioner extend that limit. (Compl., Doc. 1.) The record does not indicate the Commissioner ever granted the extension. The request alone does not suffice to lengthen the limitations period. *Loyd v. Sullivan*, 882 F.2d 218, 219 (7th Cir. 1989) ("According to the statute, the decision to grant an extension rests within the discretion of the Secretary, and so it is not enough for [the plaintiff] to show that a request was made."). Plaintiff's counsel has been warned of this rule before. *Smith v. Comm'r of Soc. Sec.*, No. 10-CV-12691, 2011 WL 1812609, at *2-3 (E.D. Mich. Mar. 17, 2011) (rejecting counsel's argument that a "request for an extension from the Appeals Council is tantamount to an actual extension granted by the Appeals Council"), *Report & Recommendation adopted by* 2011 WL 1810137, at *1 (E.D. Mich. May 12, 2011). Nonetheless, Defendant has not presented any argument on this point, either in her responsive pleading, (Answer, Doc. 10), or in her motion, (Doc. 18). I therefore recommend treating any statute of limitations argument as waived. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (discussing waiver).

## B.     Standard of Review

The Social Security system contains a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the factual determinations for substantial evidence. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The administrative process provides multiple opportunities for reviewing the state agency's initial determination. The Plaintiff can first appeal the decision to the Social Security Agency, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987). Once this administrative process is complete, an unsuccessful claimant may file an action in federal district court. *Sullivan*

3

*v. Zebley*, 493 U.S. 521, 524-28 (1990), *superseded by statute on other grounds*, Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction under 42 U.S.C. § 405(g) to review the Commissioner's final administrative decision. The statute limits the scope of judicial review, requiring the Court to "'affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The court's review of the decision for substantial evidence does not permit it to "'try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.'" *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) ("[A]n ALJ is not required to accept a

claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial evidence to support a different conclusion.'" *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). *See also Mullen*, 800 F.2d at 545. The court can only review the record before the ALJ. *Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). *See also Jones*, 336 F.3d at 475. "[T]he . . . standard is met if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Longworth*, 402 F.3d at 595 (quoting *Warner*, 375 F.3d at 390). "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

A court's review of the Commissioner's factual findings for substantial evidence must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the

court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006); *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999))).

### C.  Governing Law

"'The burden lies with the claimant to prove that she is disabled.'" *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010) (quoting *Foster*, 279 F.3d at 353); *accord Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994)). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. §§ 401-434, and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. §§ 1381-1385. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty-stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston*, 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones*, 336 F.3d at 474. *See also Cruse*, 502 F.3d at 540. The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national

7

economy that [the claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.   ALJ Findings

The ALJ found at step one that Plaintiff met the insured-status requirements through March 31, 2010, and had not engaged in substantial gainful activity since December 1, 2006, the alleged onset date. (Tr. at 26.) At step two, the ALJ concluded that Plaintiff had the following medically determinable impairments: "heart problems–high blood pressure (post-status mitral valve repair), migraine headaches, stomach ulcers, and right leg nerve damage . . . ." (*Id.*) At step three, the ALJ found that none of the impairments, alone or together, met or equaled any listed impairment. (*Id.*) At step four, the ALJ found that Plaintiff could perform past relevant work as a credit reference clerk and shoe salesperson. (Tr. at 29-30.) Alternatively, at step five, the ALJ concluded that Plaintiff could perform a limited range of sedentary work in jobs existing in significant numbers in the regional economy. (Tr. 26-29.)

### E.   Administrative Record

### 1.   Medical Records

The earliest medical report in the record comes from a physical examination conducted on November 1, 2006 by Academic Internal Medicine. (Tr. at 373.) The physician found lower-back pain, thyroid problems, and pelvis issues. (Tr. at 374, 378.) However, a June 2007 spinal CT scan did not uncover significant issues, only straightening of the cervical vertebrae, possibly due to spasms, and mild osteophytes. (Tr. at 235.) The November 2006 appointment notes state Plaintiff smoked one pack of cigarettes a day. (Tr. at 374.) The next month, treatment notes describe her

complaints of abdominal pain, but the examination was "benign" and the examiner concluded that "mild" gastrointestinal problems were "possible." (Tr. at 371-72.) But within two weeks, the pain had ended. (Tr. at 369.) In March and May 2007 she reported daily headaches, weakness, fatigue, and right eye pain. (Tr. at 365, 367.) However, she also stated that she experienced fewer migraines and felt that the current level was "ok." (Tr. at 363.) Her stomach discomfort returned as well, unrelieved by Prilosec and Zantac. (Tr. at 365.) In August 2007, she returned to Academic Internal Medicine, complaining of severe headaches, only occasionally relieved by Vicodin. (Tr. at 361.) The physician instructed her to take Topamax for the migraines and use Vicodin for "acute episodes." (*Id.*) When she came back the next month, she reported diarrhea and stomach cramping. (Tr. at 359-60.)

In May, she underwent an abdominal ultrasound, which returned with normal results, (Tr. at 220-21), and an esophagogastroduodenoscopy ("EGD") with biopsy. (Tr. at 223-24.) The EGD report listed two diagnoses, erosive gastritis and severe duodenitis, but ruled out helicobacter pylori disease. (Tr. at 223.) The doctor recommended avoiding "aspirin and nonsteroidal anti-inflammatory drugs and tak[ing] an H2 blocker . . . ." (*Id.*)

Her headaches, and sometimes chest pain, prompted numerous trips to the emergency room, producing reams of reports. (Tr. at 181-322, 453-601.) Her first occurred on February 3, 2007, when her migraine reached level ten-out-of-ten on a visual analog ("VA") scale. (Tr. at 181.) Her vision remained clear, and light did not aggravate her headaches. (Tr. at 184.) The notes report that Plaintiff had treated with a neurologist two years prior and a computed tomography ("CT") scan was negative. (*Id.*) Despite complaining her neck felt stiff, the examiner found that it remained supple and non-tender. (*Id.*) She maintained normal range of motion in all her extremities and

appeared alert. (*Id.*) Her pain began to dissipate and she left the hospital with a Vicodin prescription. (Tr. at 185.)

Two weeks later, she returned with a renewed headache and also arm pain. (Tr. at 190.) No other symptoms afflicted Plaintiff, and she rated the pain at level eight on a VA scale. (Tr. at 191.) A CT scan showed "[p]rominent adenoid tissue" but "[n]o acute intracranial process." (Tr. at 193.) She was back at the emergency room on February 25 with a headache and nausea. (Tr. at 196.) The examination again found her systems normal, including her range of motion, strength, and gait. (Tr. at 199.) At discharge, the hospital staff told her that she had been in "frequently" and would need "to show proof of follow-up with [a primary-care physician] or neurologist." (Tr. at 200.) When she returned to the emergency room a month later, she reported that she scheduled a neurologist appointment for the next month, although no reports from that appointment appear in the record. (Tr. at 203.) She again had normal results during her physical examination. (Tr. at 203-05.)

Her visits to the emergency room over the next year were similar: she complained of throbbing headaches, her physical examinations were normal, she received intravenous medications, and the pain diminished within hours of arrival. (Tr. at 208-19, 225-34, 238-55, 262-68, 270-83, 297-303, 306-15, 322-38.) Her prescriptions were usually ineffective, she reported. (*Id.*) At times, she claimed that lighting aggravated her pain, (Tr. at 228, 241, 253, 274, 281, 309, 330), or that her vision was affected, (Tr. at 271, 281). During the July 21, 2008 session, the hospital staff suspected substance abuse and informed Plaintiff that she could no longer receive narcotics from the hospital. (Tr. at 329, 331.)

The diagnostic results produced during the visits came back normal. A CT scan in May again displayed "[n]o acute intracranial process" and the radiologist found "[n]o significant change

10

from [the] prior examination" in February. (Tr. at 231.) Another CT scan, on August 14, 2007, returned unremarkable, as did a urology test conducted the same day. (Tr. at 247-49.) A January 2008 magnetic resonance imaging ("MRI") test of Plaintiff's brain similarly displayed nothing noteworthy except possible chronic mastoiditis. (Tr. at 304-05.)

On September 16, 2007, Plaintiff saw Dr. Maheskumar Patel at the emergency department of the Detroit Medical Center regarding her abdominal pain. (Tr. at 257.) Her stomach began to hurt over the past week whenever she ate or drank. (*Id.*) The physical examination uncovered no abnormalities, and even her abdomen had only "slight tenderness." (Tr. at 257-59.) She received intravenous medication and her pain improved. (Tr. at 258.) Dr. Patel noted that laboratory results were "negative." (Tr. at 259.) An endoscopy performed shortly after Dr. Patel's report revealed acute and chronic gastritis "with normal colon." (Tr. at 269.) Dr. John Parmely, who performed the procedure, prescribed a two month supply of Nexium and recommended a high-fiber diet. (Tr. at 270.)

On November 25, 2007, she went to the emergency room when, after taking medicine for wrist pain, her chest began to ache and her face and arms tingled. (Tr. at 284, 287.) Her breathing, range of motion, strength, and reflexes were normal. (Tr. at 287-88.) Likewise, a cranial CT scan showed no abnormalities, electrocardiogram ("EKG") was normal, and her sinus rhythm was normal. (Tr. at 292-93.) She returned on May 15, 2008, complaining of chest congestion and upper-stomach pain. (Tr. at 316.) A chest x-ray was normal and the notes characterized Plaintiff's complaints as "moderate cold symptoms." (Tr. at 317-19.)

Plaintiff began seeing a neurologist, Dr. Tessy Jenkins, in January 2008 to treat her headaches. (Tr. at 396.) Plaintiff said the average migraine lasted two days, was aggravated by

light (photophobia) and noise (phonophobia), but denied any "associated neurological deficits" or "visual changes." (*Id.*) Her neck was supple and moved in a full range, her back was straight and non-tender, and her neurological examination was normal, including her gait and coordination. (Tr. at 396-97.) Dr. Jenkins sketched a comprehensive plan to treat the pain, including MRIs, other tests, and prescriptions. (Tr. at 397-98, 405.) However, she noted, "The onset of symptoms in the last year makes it unlikely to be migraines." (Tr. at 397.) During the next session a few weeks later, Dr. Jenkins reported that many of those tests, though suggesting minor abnormalities, were "normal." (Tr. at 395.) The neurological examination was again unremarkable and Dr. Jenkins now planned to see Plaintiff in a few months or sooner if necessary. (*Id.*)

When Plaintiff returned in June 2008, she claimed that the migraines continued and the medications proved ineffectual. (Tr. at 393.) But Plaintiff's neurological signs again gave no cause for concern; she had normal strength, walked without issue, and had full range of neck motion. (*Id.*) Dr. Jenkins increased the Topamax dosage and prescribed extra strength Vicodin. (Tr. at 393-94.) The combination proved effective and in May Plaintiff told Dr. Jenkins she was "doing well" and requested refills. (Tr. at 392.) Her progress held through her next appointment in November 2010, when she repeated that she was "doing well" and only requested a minor change to the prescription mix due to gastrointestinal irritation. (Tr. at 391.)

Plaintiff saw Dr. Sandra Jones on March 11, 2009. (Tr. at 358.) She informed Dr. Jones of her headaches, her medicine's ineffectiveness, and the stiffness that creeped into her neck during the headaches, but she denied photophobia. (*Id.*) Dr. Jones surmised that the headaches related to her uncontrolled hypertension. (*Id.*) She continued Plaintiff's migraine medications and prescribed Benicar and Inderal for the hypertension. (*Id.*) Plaintiff returned in August seeking "clearance for

foot surgery," (Tr. at 357), which would successfully remove a "soft corn" on a toe later that month, (Tr. at 341-44). According to Dr. Jones, Plaintiff had no shortness of breath or chest pain, her headaches were "off and on," and Plaintiff had stopped taking most of her medications "for no reason . . . ." (Tr. at 357.) Dr. Jones now thought that Plaintiff's noncompliance caused the hypertension to continue. (*Id.*) She tweaked the prescriptions and cleared Plaintiff for surgery. (*Id.*)

Plaintiff next visited Dr. Jones on March 31, 2010, complaining of "worsening epigastric pain associated with nausea." (Tr. at 356.) Her blood pressure was "actually . . . on the low side," Dr. Jones noted. (*Id.*) She referred Plaintiff to Dr. Anthony Williams, a gastrointestinal specialist. (*Id.*) On April 21, 2010, Dr. Williams conducted an EGD, confirming Plaintiff's gastritis and also discovering a duodenal ulcer. (Tr. at 350, 379.) He followed up with her a few days later for a consultation. (Tr. at 353.) His notes report that the ulcer was inactive, and also mention inactive hypertension. (*Id.*) The examination did not reveal anything amiss, and her abdomen was not tender. (Tr. at 353-54.) He prescribed Prilosec and recommended she return in three months. (Tr. at 354.) In June, Dr. Jones noted that Plaintiff's hypertension was "well controlled," and that the epigastric medication"has controlled her symptoms well." (Tr. at 355.)

Plaintiff returned to Dr. Jenkins on May 20, 2010, reporting that she was "doing well on her current medications . . . ." (Tr. at 392.) The review of her systems and neurological examination were normal, finding adequate strength and stable gait. (*Id.*) Dr. Jenkins made the same findings when she next saw Plaintiff, on November 24, 2010, and again reported that Plaintiff was "doing well . . . ." (Tr. at 391.) She also prescribed Dilaudid, a medication Plaintiff often received at the emergency room, "for rescue therapy and to prevent ER visits if possible." (*Id.*)

Dr. Raylene Platel examined Plaintiff on November 30, 2010. (Tr. at 420.) Plaintiff informed her of the stomach pain and gastric ulcers, and also noted that her doctors recently discovered she had "a leaking mitral valve." (*Id.*) Surgery was scheduled in a few days. (*Id.*) Dr. Platel's notes confirm the mitral valve murmur, but she found Plaintiff's stomach non-tender. (*Id.*) She also wrote that Plaintiff's hypertension was well controlled and continued her medications treating it. (Tr. at 421.)

Plaintiff underwent a mitral valve repair surgery on December 2, 2010 to resolve her mitral insufficiency. (Tr. at 411.) The surgeon, Dr. Jeffrey Altshuler, confirmed the mitral disease during the procedure and performed the repair. (Tr. at 411-12.) She remained in the hospital following the surgery and "developed uncontrolled hypertension." (Tr. at 407-08.) Still in the hospital a few days later, she began complaining of right leg neuropathy and chronic pain. (Tr. at 408.) A CT scan of her pelvis showed a possible hematoma, potential deep venous thrombosis, and "[n]onspecific free fluid within the pelvis." (Tr. at 415.) The hospital released her on December 16, at which time she "was ambulating in the hallway without difficulty . . . ." (*Id.*) An echocardiogram performed on January 7, 2011, to check her heart after the surgery, showed that the mitral valve area was "normal . . . consistent with recently placed mitral annular ring for mitral valve repair" and found no evidence of mitral insufficiency. (Tr. at 444.)

On January 4, 2011, Dr. Nancy DeSantis diagnosed Plaintiff with femoral neuropathy and a history of right groin hematoma. (Tr. at 413-14.) Plaintiff reported "significant pain in her right groin region, as well as numbness over her anterior thigh with walking." (Tr. at 413.) Dr. DeSantis noted she used a cane and sometimes a walker. (*Id.*) The pain disrupted her sleep. (*Id.*) Her right thigh and groin swelled occasionally, but she did not fall when walking. (*Id.*) The physical

14

examination found Plaintiff's breathing normal, her abdomen was non-distended, her groin had

swelling, the right thigh had "mild" swelling," her hip range of motion was normal, her right hip

strength was normal with some pain, and she had "diminished to absent" sensation over her right

anterior thigh. (*Id.*) Her gait was antalgic and slow with a cane, but stable and well balanced. (*Id.*)

Plaintiff saw Dr. Ashok Gupta on January 7, 2011, denying chest pain and shortness of

breath but continuing to complain about thigh pain and groin swelling. (Tr. at 442.) Her breathing

was clear, her neck was supple, her abdomen was non-tender, her right thigh had "some swelling,"

and her reflexes and strength were normal. (*Id.*) Along with right thigh pain, he diagnosed anemia

and discontinued one medication due to her low blood pressure. (*Id.*) The problems remained

present during their next session on January 26, although Plaintiff said her thigh pain was "much

improved." (Tr. at 441.) The examination was again normal and Dr. Gupta did not note anemia in

his report. (*Id.*) In March, she claimed to have chest pain, exacerbated by movements, and dyspnea.

(Tr. at 440.) She informed Dr. Gupta that she continued to smoke one pack of cigarettes a day. (*Id.*)

Her breathing sounded clear, according to the doctor, and he found only mild tenderness when

palpating her abdomen. (*Id.*) Her reflexes and strength were normal. (*Id.*) He changed her

medications and told her to return in one month. (*Id.*)

In May, she informed Dr. Gupta that her stomach felt bloated, the dyspnea persisted, and

her heart raced. (Tr. at 439.) But Dr. Gupta thought her breathing sounded clear, her heart seemed

normal without murmur, her abdomen again had only mild tenderness, and her strength and

reflexes were normal. (*Id.*) A recent chest x-ray "was negative," he added. (*Id.*) Two weeks later

the chest pain had ceased, but the dyspnea continued and both of her legs now swelled. (Tr. at

438.) She told Dr. Gupta she "sits most of the day." (*Id.*) The examination mirrored the prior ones,

except he noted edema in both legs. (*Id.*) He provided medications, discussed leg elevation, and advised her to wear knee high support hose. (*Id.*) These recommendations seemed to work; when she returned in June her leg swelling had "completely subsided," although her right thigh still ached. (Tr. at 437.) She asserted the right thigh still felt swollen, but Dr. Gupta did not find any edema in her legs. (*Id.*) The examination found nothing else amiss. (*Id.*)

Around this time Plaintiff also saw Dr. Sandra Jones-Lackey, reporting shortness of breath and palpitations, but no chest pain. (Tr. at 417.) Walking only one block could cause the shortness of breath. (*Id.*) She admitted to smoking one pack per day and that a cardiologist's recent echocardiogram came back "fine." (*Id.*) She also asserted leg edema, fatigue, and weakness. (*Id.*) Her breathing and cardiovascular system appeared normal to Dr. Jones-Lackey, her abdomen was non-tender and only "[t]race edema" was noted.[2] (*Id.*)

Dr. William Joh reviewed the medical evidence for the state agency and produced a residual functional capacity analysis on August 23, 2011. (Tr. at 89-90.) He concluded that Plaintiff could perform a limited range of light work: she could occasionally (less than one-third of an eight-hour workday) lift twenty pounds; frequently (up to two-thirds of an eight-hour workday) lift ten pounds; stand or walk for six hours during a workday; sit for six hours during a workday; and pull

---

[2] The ALJ did not consider many of the reports in the current record, which Plaintiff submitted for the first time to the Appeals Council. (Tr. at 32-35, 180, 445-601.) In this Circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

16

or push without restriction. (*Id.*) He also noted she should avoid concentrated exposure to hazards, such as machinery and heights, due to her migraines. (Tr. at 90.)

### 2.     Evidence from the Application Forms and Administrative Hearing

Plaintiff filled out a function report on June 10, 2011. (Tr. at 150-57.) She claimed that various impairments prevented her from working, including headaches, shortness of breath, leg pain, and high blood pressure. (Tr. at 150.) The medications made her drowsy during the day, but the pain kept her up at night. (Tr. at 151.) Swollen legs and feet ruled out certain clothes and also impeded daily tasks, such as standing to curl her hair, she claimed. (*Id.*) She could fix basic meals, mostly sandwiches or snacks taking around five minutes to prepare. (Tr. at 152.) She spent a few hours each week cleaning, but needed frequent breaks and encouragement. (*Id.*) Though she could ride in a car, her only trips out were to buy groceries or see her doctor, generally once per month, and sometimes to dine at a restaurant. (Tr. at 153.) Handling finances presented no problems, nor did tasks requiring mental effort, though completing them sometimes proved difficult. (Tr. at 153, 155.) Family visited and called infrequently, and most socializing occurred during holidays. (Tr. at 154.) She claimed difficulty with four items: standing, which she could do for fifteen minutes; walking, up to half a block; climbing stairs; and completing tasks. (Tr. at 155.) The impairments did not diminish her ability to focus, follow instructions, or relate to others. (Tr. at 155-56.) She also claimed that a doctor prescribed a walker on December 17, 2010, when she "was released from Beaumont Hospital of Royal Oak." (Tr. at 156.) In another form, she claimed to experience at least fifteen seizures per month over the prior three years. (Tr. at 146-47.)

Plaintiff attended an administrative hearing on March 16, 2012. (Tr. at 36-82.) She was unrepresented but declined the ALJ's offer to delay the proceeding so that she could obtain

counsel. (Tr. at 38-46.) Plaintiff's opening statement focused on her recent heart surgery, nerve damage in her right leg, and breathing troubles, which she asserted came from chronic obstructive pulmonary disease ("COPD"). (Tr. at 48.) She usually needed a cane to walk and indicated she had left it in the car before the hearing because the pain pill she took that morning was helping. (Tr. at 50, 68.) The medications eased the pain, but never fully. (*Id.*) She also mentioned that her migraines struck every day or every other day, and her hypertension was a recurrent, "uncontrollable" problem. (Tr. at 48-49.) She claimed the nerve damage in the leg occurred during a surgery; the ALJ responded he could not find confirmation in the exhibits. (Tr. at 69-70.)

Her household included two teenage children, an infant grandson, and her husband. (Tr. at 51.) Her daughter worked part-time and her son attended high school. (Tr. at 52-53.) Her house had a finished basement; eight steps led down to her bedroom. (Tr. at 67.) Plaintiff then stated she never finished high school, making it to the start of twelfth grade before dropping out to care for her son. (Tr. at 54-55.) She last worked in 2006 or 2007, she recalled, quitting when her illnesses disrupted her attendance. (Tr. at 55-56.) Her work record in 2004 and 2005 was spotty, she admitted, due to hypertension and migraines. (Tr. at 56.) She could not remember if she saw a neurologist at that time. (Tr. at 56-57.) Since 2007 she stayed "[a]t home taking care of [her] kids." (Tr. at 73.) Regarding her grandson, she stated, "I do what I can or whatever, but when [her daughter, the mother is] at work, I don't watch him, keep him, because I can't keep him." (Tr. at 74.)

Plaintiff told the ALJ that in November 2011 she was diagnosed with COPD, and offered a computer disk with the record. (Tr. at 59-60.) But after opening it on a computer, she apparently could not find the file and the ALJ moved on to her migraines. (Tr. at 61.) No doctor had

discovered the source of her pain and she agreed that the MRIs in her file were "negative." (Tr. at 61-62.) Regarding her medications, Dilaudid was available only at the emergency room, she confirmed, but Paracet could be prescribed and was the only treatment method Dr. Jenkins endorsed. (Tr. at 63.)

The ALJ then asked the vocational expert ("VE") whether a person with the following RFC could perform Plaintiff's past work:

> [She was] able to occasional[ly] lift 20 pounds and frequently lift 10 pounds, stand and walk about six hours in an eight-hour day, sit up to six hours in an eight-hour day, pushing and pulling are within the same limitations, no need for a sit-stand option, able to climb six steps of stairs occasionally, no climbing ladders, ropes, or scaffolds; no environmental limitations except avoid concentrated exposure to fumes, odors, gases, poor ventilation, fast-moving or heavy machinery or heights .
> . . .

(Tr. at 78.) The ALJ responded that she could work as a credit reference clerk and shoe salesperson. (*Id.*) If the RFC was changed to sedentary, the VE concluded she could still perform the credit reference clerk position. (Tr. at 79.) Other jobs also conformed to that last hypothetical RFC for individuals with Plaintiff's background: telemarketer (34,000 positions in southeast Michigan; 341,000 nationally) and check cashier (5000 positions in southeast Michigan; 10,000 in Michigan). (Tr. at 79-80.) Both positions were sedentary, according to the VE. (Tr. at 79.) Finally, the skills Plaintiffs acquired as a credit reference clerk and shoe salesperson would transfer to the telemarketer position. (Tr. at 80.)

## F.    Analysis and Conclusions

### 1.    Legal Standards

The ALJ determined that during the time Plaintiff qualified for benefits, she had the residual functional capacity ("RFC") to perform a limited range of light work:

19

[T]he claimant had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) except is occasionally limited with climbing stairs, stooping, kneeling, crouching, and crawling; is unable to climb ladders, ropes, or scaffolds; must avoid concentrated exposure to fumes, odors, gases, and poor ventilation; and must avoid driving and fast moving, heavy machinery.

(Tr. at 26.) Light work

involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b), 416.967(b).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2.    Substantial Evidence

If the Commissioner's decision applied the correct legal standards and is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence could justify the opposite conclusion. 42 U.S.C. § 405(g); *McClanahan*, 474 F.3d at 833; *Mullen*, 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Plaintiff pursues two arguments against the ALJ's decision. (Doc. 16 at 7-22.) First, she claims he failed to support his credibility determination with any analysis or evidence. (*Id.* at 9-10.) Then she criticizes his reasoning, asserting that he "understated the severity of Plaintiff's migraine

headaches" and ignored evidence of nerve damage. (*Id.*) She then simply copies her summary of the facts from above. (*Id.* at 10-14.) Her second claim contends that the ALJ's RFC failed to encompass all her relevant impairments. (*Id.* at 14-22.) She baldly asserts that she cannot perform light work, or any work at all, then discusses the regulations and again copies her recitation of the facts. (*Id.* at 15-21.) She ends by claiming the error is not harmless. (*Id.* at 21-22.) Besides the unadorned statement that she cannot work, Plaintiff does not discuss what limitations she wishes the ALJ had included, or how the copied fact sections links to more severe restrictions.

### 1.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B); *accord* 20 C.F.R. § 404.1520(a)(3); *Wyatt*, 974 F.2d at 683. The regulations carve the evidence into various categories, but the only relevant distinction for present purposes is between "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). There are important differences between the two types of sources. For example, only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2.

Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such

opinions the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her residual functional capacity. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources, including treating opinions not given controlling weight, 20 C.F.R. § 404.1527(c), and the ALJ should use the same analysis for "other source" opinions as well. *See Cruse*, 502 F.3d at 540-42; SSR 06-3p, 2006 WL 2329939, at *2. The test looks at whether the source examined the claimant,  "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544; *see also* 20 C.F.R. § 404.1527(c).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion[, including treating sources]," regarding whether a person is disabled or unable to work, whether an

impairment meets or equals a Listing, the individual's residual functional capacity ("RFC"),[3] and the application of vocational factors. *Id.* § 404.1527(d)(3).

Additionally, a physician's "notation in his notes of a claimed symptom or subjective complaint from the patient is not medical evidence; it is the 'opposite of objective medical evidence.' . . . An ALJ is not required to accept the statement as true or to accept as true a physician's opinion based on those assertions." *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1067 (N.D. Ill. 2011) (quoting *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010)). "Otherwise, the hearing would be a useless exercise." *Id. See also Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) (noting that there was no medical opinion in "Dr. Kllefer's pain-related statement . . . [because] it merely regurgitates Francis's self-described symptoms."); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 (6th Cir. 2009) ("[S]ubstantial evidence supports the ALJ's determination that the opinion of Dr. Boyd, Poe's treating physician, was not entitled to deference because it was based on Poe's subjective complaints, rather than objective medical data.").

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

---

[3] The Commissioner's discretion to determine the claimant's RFC is less capacious than it appears at first. While the ALJ determines the RFC, the ALJ might be required to give controlling weight to treating source opinions on specific limitations. *See* 20 C.F.R. § 404.1513(b)-(c) (describing that medical reports can include a source's "statement about what [the claimant] can still do despite [her] impairments"). These opinions would necessarily affect the RFC. *See Green-Young v. Barnhart*, 335 F.3d 99, 106-07 (2d Cir. 2003) (holding that treating physician's opinion that claimant could not sit or stand for definite periods "should have been accorded controlling weight").

23

> must contain specific reasons for the weight given to the treating source's
> medical opinion, supported by the evidence in the case record, and must be
> sufficiently specific to make clear to any subsequent reviewers the weight the
> adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an

ALJ can properly reject a treating source opinion if it lacks supporting objective evidence. *Revels*

*v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273,

1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision). "This requirement is not

simply a formality; it is to safeguard the claimant's procedural rights." *Cole*, 2011 WL 2745792,

at *4. "[A] failure to follow the procedural requirement of identifying the reasons for discounting

the opinions and for explaining precisely how those reasons affected the weight accorded the

opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be

justified based upon the record." *Rogers*, 486 F.3d at 243.

When a disability determination that would be fully favorable to a claimant cannot be made

solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the

claimant, considering the claimant's statements about pain or other symptoms with the rest of the

relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility

determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y*

*of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility

assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No.

09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377,

379 (6th Cir. 2001)); *Warner*, 375 F.3d at 390. However, "[i]f an ALJ rejects a claimant's

testimony as incredible, he must clearly state his reasons for doing so." *Felisky,* 35 F.3d at 1036.

24

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "'objective evidence of the pain itself'" is not required, *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweicker*, 749 F.2d 1066, 1071 (3d Cir. 1984)), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)   [D]aily activities;

(ii)   The location, duration, frequency, and intensity of . . . pain;

(iii)   Precipitating and aggravating factors;

(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)   Treatment, other than medication, . . . received for relief of . . . pain;

4:13-cv-14595-MAG-PTM   Doc # 19   Filed 12/19/14   Pg 26 of 33   Pg ID 762

(vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3). *See also Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers*, 486 F.3d at 247. *See also Cruse*, 502 F.3d at 542 (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones*, 336 F.3d at 475 ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

The claimant must provide evidence establishing the RFC. "An individual shall not be considered to be under a disability unless [she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most [she] can still do despite [the] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2). The Plaintiff bears the burden of proof during the first four stages of analysis. *Jones*, 336 F.3d at 474. In the first four steps, the claimant must prove her RFC. *Her v. Comm'r of Soc. Sec.*, 203 F.3d

26

388, 391 (6th Cir. 1999). At step five, the Commissioner does not have to add anything to the RFC, 20 C.F.R. §§ 404.1560(c), 416.960(c); *Roby v. Comm'r of Soc. Sec.*, 48 F. App'x 532, 538 (6th Cir. 2002); *DeVoll v. Comm'r of Soc. Sec.*, 234 F.3d 1267, 2000 WL 1529803, at *3 (6th Cir. 2000) (unpublished table decision); *Her*, 203 F.3d at 391-92. The hypothetical is valid if it includes all credible limitations developed prior to step five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 2009).

## 2.    Analysis

I suggest the ALJ's credibility analysis was adequate. (Tr. at 27-29.) Plaintiff argues that the ALJ merely recapitulated the evidence, skipping any analysis and laying out a short "boilerplate" conclusion. (Doc. 16 at 9.) This ignores the discussion leading up to that conclusion, which engaged and evaluated the evidence rather than simply regurgitating it. His analysis hit all the relevant regulatory factors. 20 C.F.R. § 404.1529(c)(3)(i).

The ALJ began where the regulation begins, at Plaintiff's daily activities. (Tr. at 27.) He noted that her functional report form stated she socialized, left her house occasionally, and cared for her children after quitting work. (*Id.*) The record bears out these observations, (Tr. at 73, 152-54), and they all support the ALJ's conclusion. But he did not rely on these alone, and he acknowledged the contrary evidence, such as that she claimed to use a cane and appeared in pain at the hearing. (Tr. at 27.) The ALJ then moved on to discussing the frequency of her migraines, (*Id.*), in line with the regulation. 20 C.F.R. § 404.1529(c)(3)(ii). She claimed to experience migraines nearly every day, but the notes from Dr. Jenkins, the physician treating her migraines, stated her headaches were "unlikely to be migraines." (Tr. at 27, 397.)

27

He clearly scanned the record for objective evidence to weigh her assertions against, (Tr. at 27), finding one diagnosis of migraines, potentially attributable to substance abuse, (Tr. at 331), but nothing in any diagnostic test indicating she had this issue, (Tr. at 231, 247-49, 292-93, 304-05, 395). Though other emergency room reports also mentioned possible migraines, (Tr. at 185, 194, 200, 205, 217, 242, 254, 275, 282, 301, 326), those reports also consistently found normal results from all objective measures. (Tr. at 208-19, 225-34, 238-55, 262-68, 270-83, 297-303, 306-15, 322-38.) Pointing to them as evidence as evidence of disability essentially points to the subjective complaints they document, as they do not provide objective proof.[4] All the objective evidence lays against her. Moreover, as the ALJ noted, (Tr. at 27), in the more recent records, from 2010, Dr. Jenkins wrote that the prescriptions were helping and Plaintiff was "doing well." (Tr. at 391-92.)

The ALJ also noted the lack of objective support for her nerve damage claims. (Tr. at 28.) Dr. DeSantis diagnosed femoral neuropathy, but her examination, like all others, found her strength and range of motion were normal. (Tr. at 413.) She walked steadily, if slowly, and had only "mild" thigh swelling. (*Id.*) Apparently only one session with Dr. DeSantis took place. No other reports document problems walking, (Tr. at 199, 392, 415), and the few notes mentioning her thigh problems generally characterize the swelling as mild. (Tr. at 437, 438, 442.) The most recent notes, from Dr. Gupta in 2011, reported that her thigh pain and swelling had improved. (Tr. at 437, 441.) At the hearing, Plaintiff claimed the nerve damage occurred during a surgery, (Tr. at 69), but the operation notes do not mention it, (Tr. at 407-12). While in the hospital after surgery, she complained of "right leg neuropathy," yet the "Anesthesia Pain Service" saw her and the notes

---

[4] Plaintiff also cites exhibits that were not submitted to the ALJ, (Tr. at 445-601), which the court also cannot consider. (Doc. 16 at 12-13.)

do not show that anything more occurred. (Tr. at 408.) The ALJ examined this evidence and reached the proper conclusion. (Tr. at 27-28.) In any case, the evidence Plaintiff cites, including the diagnosis itself, (Doc. 16 at 5-6), came in 2011, (Tr. at 413), after her last insured date of March 31, 2010. (Tr. at 26.) Such evidence "is generally of little probative value." *Strong v. Social Sec. Admin.,* 88 F. App'x 841, 845 (6th Cir. 2004); *see also Collins v. Astrue*, No. 3:12-cv-089, 2013 WL 80363, at *3 (S.D. Ohio Jan. 7, 2013) (citing *Bogle v. Sec. of Health & Human Servs.*, 998 F.2d 342 (6th Cir. 1993); *Johnson v. Sec. of Health & Human Servs.*, 679 F.2d 605 (6th Cir. 1982); *Bagby v. Harris*, 650 F.2d 836 (6th Cir. 1981)).

The ALJ sufficiently analyzed Plaintiff's claims of gastrointestinal issues and her breathing and COPD complaints. (Tr. at 28.) Plaintiff does not develop any argument regarding these impairments, (Tr. at 9-10), but like her migraine and leg arguments, any evidence she could rely on would do little more than establish that she complained about these problems. Objective evidence established gastritis and ulcers. (Tr. at 223, 269, 350, 379.) But nothing suggests these were disabling. Her September 2007 visit to the emergency room found only "slight tenderness" in her abdomen, and laboratory results were "negative." (Tr. at 257-59.) Most other examinations of her abdomen did not discern observable issues, such distension or tenderness. (Tr. at 413, 442.) Any tenderness listed in other reports was mild. (Tr. at 439.) Dr. Williams, a specialist, confirmed the impairments but did not find any abnormalities during the physical examination. (Tr. at 353-54.) Dr. Jones concluded in 2010 that the mix of medications "has controlled her symptoms well." (Tr. at 355.)

Her breathing problems do not appear to have been severe. As the ALJ mentioned, Plaintiff admitted to smoking one pack of cigarettes a day against doctors' advice. (Tr. at 28-29, 374, 421,

440.) Significantly, reports invariably stated she breathed clearly and without difficulty. (Tr. at 184, 191-92, 199, 204, 211, 216-17, 228, 241, 246, 253, 274, 281, 287, 300, 317, 325, 330-31, 413.) Chest x-rays and other tests came back normal. (Tr. at 319, 417.) In 2011, she denied chest pain or shortness of breath during a session with Dr. Gupta, (Tr. at 442), and when she later complained about these problems he concluded that her breathing was clear. (Tr. at 439, 440.) The first mention of COPD comes from Plaintiff's testimony at the hearing; the source of the diagnosis remains undisclosed. (Tr. at 48.) Thus, the ALJ's conclusion that her complaints lacked credibility was justified. (Tr. at 28-29.)

For the same reasons, the ALJ's RFC adequately reflects the evidence. As noted, Plaintiff does not submit specific additional limitations she labors under, except she argues she cannot complete light work or any other work at all. (Doc. 16 at 15.) In contrast, the ALJ carefully calibrated the RFC to match the evidence. First, the limitations acknowledge three of the four areas Plaintiff flagged in her function form: standing, walking, and climbing stairs.[5] (Tr. at 26, 155.) He limited her to standing or sitting each for up to six hours a day. (Tr. at 26.) This reasonably accommodates her leg pain, which as described above was not well established by the evidence. The medical source who recommended her cane and walker is unknown; she brought it up at the hearing and her paperwork, (Tr. at 50, 156), though Dr. DeSantis noted she used them. (Tr. at 413.) She did not always take them with her, she admitted, (Tr. at 50), and she also stated she could walk without risk of falling. (Tr. at 413.) Moreover, the VE testified that the credit reference clerk position could be performed at the sedentary-exertional level. (Tr. at 79.) The ALJ's decision noted this alternative, stating that she "could still perform the credit reference clerk position even if she

---

[5] The fourth problem area, task completion, lacks any corroborating evidence. (Tr. at 155.)

30

[were] limited to sedentary work . . . ." (Tr. at 30.) Plaintiff told the ALJ at the hearing that she used stairs, presumably every day, to access her bedroom basement. (Tr. at 67.)

Aside from her subjective complaints, nothing supports a more restrictive RFC. Her strength and reflexes were always normal or without weakness. (Tr. at 184, 191-92, 199, 204, 211, 216-17, 228, 241, 246-47, 253, 274, 287, 300, 317, 325, 330-31, 392, 439, 440, 442.) The evidence does not translate her impairments into discrete limitations that are more severe than those listed in the RFC. For example, there is little to no evidence on the weight Plaintiff can lift or how her headaches might prevent her from lifting more than twenty pounds "at a time" or ten pounds frequently, as reflected in the "light work" requirements. 20 C.F.R. § 404.1567(b). The only indications from the record were that her strength and reflexes remained normal, even when in the hospital suffering from headaches. Her gait, which was sometimes slow, (Tr. at 413), usually appeared normal. (Tr. at 199, 392-93, 396-97.) The RFC prohibits most other actions, such as climbing ladders or working in hazardous environments. (Tr. at 26.) Further, the RFC exceeds the restrictions proposed by Dr. Joh, who provided the only medical opinion on functional capacities. (Tr. at 89-90.) Finding Plaintiff's testimony somewhat convincing, the ALJ additionally limited her stair climbing. (Tr. at 29.)

As Defendant notes, Plaintiff's attack on the "light work" conclusion is misplaced. (Doc. 18 at 15-16.) The ALJ determined at step four that she could perform her past work, including her position as a credit reference clerk. (Tr. at 29-30.) This position is sedentary, (Tr. at 30, 79), rather than "light work." *See* 20 C.F.R. § 404.1567. Thus the ALJ explicitly proposed an alternative analysis that accounted for any potential restriction to sedentary work: "Alternatively, the claimant could still perform the credit reference clerk position even if she was limited to sedentary work and

31

unable to climb more than six stairs . . . ." (Tr. at 30.) Likewise, the ALJ followed the VE in characterizing both step-five positions–telemarketer and cashier–as sedentary. (Tr. at 31, 79.) Thus, the jobs undergirding the analysis do not require as much vigor as the "light work" label suggests.

### G.   Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "'zone of choice' within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035 (quoting *Mullen*, 800 F.2d at 545), as the decision is supported by substantial evidence.

### III.   **REVIEW**

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

32

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  December 19, 2014                    /S PATRICIA T. MORRIS
                                            Patricia T. Morris
                                            United States Magistrate Judge